Court. Good morning, Your Honors. May it please the Court. James Muller for the Plaintiffs. Your Honors, the District Court's verdict was clearly erroneous. This was not a case where the District Court chose between two permissible views of the evidence. The District Court rejected the rationale, the basis for the defendant, Officer Tate's use of force, and instead substituted its own rationale for the use of force. In this case, Officer Tate said that he used force against Mr. Cerros, the decedent, and the plaintiff, Mr. Cantanjo, because he feared that they were going to run over him with a motorcycle. The basis of this claim was that Mr. Officer Tate was blocking the exit to a parking lot from which Mr. Cerros, who was the driver, and Mr. Cantanjo, who was the passenger, were trying to leave that lot. The Court found that Officer Tate could not have been blocking the exit. We proved at trial that the exit was too narrow. There was a channel which was formed by the and the exit post. He only partially blocked the exit. The Court found that this primary rationale for the use of force by Officer Tate was not credible because he could not have been in that narrow channel about four feet wide and have the motorcycle pass through it. So that rationale for the use of force is gone. Where did the forensic place him then? The forensic placed him alongside the passenger side of his vehicle. So the motorcycles would have passed. You've got the diagram? Yes, yes, the diagram. He would have passed in front of the, he would have been at the motorcycle passed in front of it. So that major, that rationale for the use of force is completely gone. The other rationale, which is related, was that... Just... Yes. I'm trying to just understand your theory, assuming that he wasn't in the channel. Just to refresh my memory on the facts, the motorcycle was headed at him. That was his... From the degree he was standing, he shot, fired at least one or two shots into the front of the motorcycle. Is that not correct? All right, I'll back up. What initially happened was the motorcycle was about 30 feet from this, head on to the exit. Officer Tate is standing to the right of the exit, if the exit, Officer Tate is about two feet out of its path. He fires the first shot, which from the forensic evidence was 19 degrees angled down and 15 off center line. Based on that, those angles, the forensics calculated that at the time the motorcycle first started to approach the exit, Officer Tate was about two feet out of the path. And the motorcycle at that point was moving slowly. At the point that it gets to Officer Tate, according to his testimony, it's traveling between 8 and 12 miles an hour, about a jog or a slow run. So we have Officer Tate out of harm's way at this point, and the rationale for use of force, use of deadly force, is gone at that point. Okay, I understand that you put some evidence in that would establish that Officer Tate was out of harm's way. What evidence is there that is uncontradicted or unchallenged in any way that establishes that he was out of harm's way? The forensic evidence, the physical evidence. There's not one bit of evidence that shows that he, one bit of forensic or physical evidence that shows that he was in harm's way at the time he fired the second shot, the fatal shot, or the third shot, the wounding shot of the passenger. And those shots had to be fired within what kind of a time frame to get three shots off? The first shot was about .6 from the second shot. First shot, then .6, the second shot, then .1, the third shot. So it was bam, bam, bam. This took place within the total time frame of what? Of the shooting? Yeah. Yeah. About a second, a little less than a second. So one second, and we're only 15 degrees off on the first, on the first shot. Yes. Okay. So how far off are we for the second and the third shot? Well, we're, we're, um, it's not, there's no, there's no, He's backing up? Or the motorcycle's moving in the opposite direction? Because if he's only two feet out of the path, Right, right. 15 degrees, it's not very far. No, it's not very far. It's a slow-moving motorcycle. It's not very far. But at the point in time of the second shot, the motorcycle's already passing the officer. He shoots Mr. Saros in the back shoulder. Motorcycle's already passing him at a slow rate of speed at this point of the second shot. At this point, of course, there is disagreement between the, between the two, between the two expert witnesses as to how the shot could have occurred, whether it had to be back to front, front to back. There's no, there, I'm sorry, I interrupted. And there's some question about, about whether, um, because of the, of the configuration of of the motorcycle itself, whether the driver, Mr. Saros, had to be leaning over the motorcycle and therefore, even though he was coming at him, a side shot would have, would have hit him in the back without actually having to shoot, having to shoot at his back. Well, there's absolutely not one shred of evidence or witness who says that he was shot front to back. Nothing like that. Every witness agrees. Forensic evidence, photographs, all show that he was shot in the back. And whether the motorcycle is leaning and how far, whether it's, whether it's tipped to one side and then how far over, over the front of the bike the driver is. Right. He's leaning forward. I think that's, I would stipulate to that, that's the way you ride a motorcycle. And all the evidence is that he's leaning forward. I don't ride motorcycles. What's that? The configuration of this motorcycle required you to lean in. Yes, it did. Some motorcycles don't. I mean. I guess a moped type or, but this was a sport. Motorcycles on the freeway, you sit straight up, you know, we got your, you know, there are all kinds of motorcycles. So in any event, this motorcycle, there's no dispute, was a, the racing posture. Yes. He was leaning forward on that. There's no dispute that he was shot. Whatever the fact is, we understand that he was shot back to front because it was an entry from the backside. Right, right. And according to our forensic expert, who was unchallenged by any other expert, he was about six to eight feet to the side of the slowly moving motorcycle when he shot. And also that is consistent with the eyewitness testimony of Plaintiff Antonio. Just to clarify, once he was going through the channel, the channel was access onto a street, is that correct? Yes. Okay. So as you come out, as he passed the GOV, there is evidence, is there not, that he was into a left turn? That's right. Left turn, just to get the visuals here, was that a sharp left turn or because it would have been a sharp, you know, as soon as you hit the exit, you can go left on the street? Yes. And I have to back up because there was, they did have a forensic expert who said that his best theory was that Plaintiff and Deceit were shot after he traversed the channel and was turning left, which is even less of a threat. The motorcycle is even less of a threat at this point. I want to go back to Judge Bybee's question about tilt and lean. All the fact witnesses, Mr. Contanjo, Plaintiff, Officer Tate, everyone else has, all these fact witnesses have the motorcycle going straight at that point. There's no tilt. There's discussion from the court that, and from the government, that the motorcycle could have been tilting at the point that it was, that plaintiffs say Mr. Saros was shot. But none of the fact witnesses say it was tilting at that time. The only time we have a tilt is, as the court correctly noted, when the motorcycle's leaving the lot. And at that point, obviously, he's not a threat anymore. Where does the motorcycle end up? It ends up out in the street? It ends up a ways, a mile or two down. Mr. Saros dies at that point. He made the left turn and got a mile or more away? Yes, and then he dies. You're out of your time, so I'll give you some time on rebuttal, but let's see what the government has to say. Thank you, Your Honor. May it please the Court, I'm Assistant United States Attorney Jason Axe, representing the defendant, Abhili. Your Honors, the case below is a three-day trial. Following trial, the district court entered findings of fact, 13 pages and 53 paragraphs, which were based on its assessment of the evidence. Well, Your Honors, plaintiff's argument today assumes one view of the evidence to be the correct view while ignoring the testimony of the eyewitness officers and disregarding the physical evidence supporting the district court's finding that Officer Tate reasonably believed that he was in danger of being seriously injured by the motorcycle. I'd like to address some of Appellant's counsel's statements and then answer any questions the Court may have. The initial statement was that the district court substituted its own rationale. That's clearly not true, Your Honor. There's sufficient evidence in the record to demonstrate that the findings of the district court were supported by evidence, including the fact that the motorcycle was going 20 to 30 miles per hour directly at Officer Tate. That was a finding by the district court, that the initial shot was fired directly into the front of the oncoming motorcycle. And let me make the initial point that the plaintiff's expert's analysis of the ballistics and the way in which this incident occurred are based on the testimony of one person, Vincent Catanjo, a convicted felon who was under the influence of marijuana and attempting to flee the scene of a crime as this occurred. Now, with the initial question about the first shot, the first shot entered into the front of the motorcycle. The issue about whether it was 15 degrees off-center at the time of the shooting is irrelevant because plaintiff's own expert testified that Officer Tate, from his position, would not have been able to tell whether the motorcycle was going to hit him or not. The second and third shots, as we've heard, it was undisputed, happened within one second. It was all part of one reaction. Now, there was testimony at trial by the plaintiff's expert about a channel. And I have up here, from the supplemental excerpts of record, page 187, which indicates, in this case, that the  motorcycle went through what they've characterized to be a channel. I've drawn two lines on this chart to represent what they meant by the channel. There is no channel that is physical that the motorcycle would have had to go through. There was only a police vehicle and a post. The rest of this area is open space. There   Now, the question about where exactly Officer Tate was at the time of the shooting  shooting is not relevant because the motorcycle took an angle like this out of the parking lot. So as the Court has noted, the question about the exact location of a parking lot, trying to flee, they would take a left turn angle to get around. So the issue about where exactly Officer Tate was at the precise moment that the bullet left the chamber was not what the district court focused on. The district court focused on what was going through Officer Tate's mind. And when he first initiated the decision to fire the weapon, as was undisputed and was set forth by the district court, he would take a go-ready position up to track the motorcycle, make the decision to fire, and then fire the weapon. During that time, even assuming that the motorcycle was only going 10 miles per hour, which is contrary to the testimony of the other witnesses, it would travel 33 feet. So we have a situation where we have a moving vehicle, we have an officer who by his testimony is backing up to try to get away from it, makes a decision to fire. During that decision-making process, the motorcycle continues towards him. He gets out of the way of the motorcycle, and the two shots go into the shoulder of the passenger who has his arms wrapped around the driver and into the backslash side of the driver. Now, the question is how did the shot get into the backslash side of the vehicle? And the court was able to determine how far the gun was held out from Officer Tate's chest and at what angle, the height at which the gun was held, the tilt of the motorcycle, the position of the riders on the motorcycle, the direction it was traveling, and the speed of the motorcycle. So the court focused not on where the bullet entered, but where the motorcycle was relative to the officer when he made the decision, I need to fire, or I'm going to get struck and potentially killed. And at that point, it was undisputed, the motorcycle was not to the side of the officer, but several feet coming towards him as he was in the process of getting out of the way. So to boil your theory down, once he fired the first shot and that was reasonable within the short space of time, the rest of it was all instinctual follow-through and even if by the time he fired the third shot, the motorcycle was to his, had actually passed him, that would have been okay? That's correct, Your Honor, especially considering the fact that it happened within less than one second. But the testimony was from the other witnesses that even after the first shot, during that moment when the motorcycle was coming and within two feet of him or slightly more, the other witnesses testified that they thought that Officer Tate was going to be hit. And certainly Officer Tate thought he was going to be hit. Was there reference in the testimony to the Weaver? He was, the firing position he was firing from? The ready Weaver position is a position where the gun is pointed down. And what had happened in the three or four minutes before this occurred was that you had police officers chasing the motorcycle around the parking lot. And Officer Tate all of a sudden with the suspicion that these individuals are armed, because as the court probably noted in the record and we pointed out in the brief, one of the police officers at a distance pulled his weapon, thinking that something was going on. And then there was another situation where another officer approached the motorcycle to try to implement O.C. spray, and then he backed away with his hands up. All this Officer Tate saw at a distance, in the dark, at night, and that went into his calculation to try to determine what was going on on this motorcycle. He was extremely surprised, as he testified, that this motorcycle would gun it straight towards him. He had testified that in his life he had seen someone struck by a motorcycle and he knew the power of a motorcycle. In fact, he was a motorcyclist. So he knew when he saw the lights pop up and the clutch, heard the clutch pop and saw this thing gun it towards him, he didn't know what was going to happen. And as the court noted, regardless of where he ends up, because the only forensics that we discussed is where he ended up at the moment the bullet left the chamber, he reasonably felt that motorcycle was coming towards him. He didn't have an opportunity to get out of the way. And fearing for his life, he fired his weapon. Unless the Court has further questions.  Thank you, Your Honor. Your Honor, the testimony was that the other aspect of the testimony of Officer Tate that the Court rejected was that he fired the second shot as the motorcycle came straight on him. At trial and before trial and statements, the Court rejected the testimony of Officer Tate. The Court found that Officer Tate said he fired the second fatal shot when the motorcycle was 10 to 25 feet in front of him, heading straight towards him. So the second part, or the other part of Officer Tate's rationale for use of deadly force was rejected by the Court. Instead, the Court put in this reaction time argument and the defense somewhat adopted it, but their own witnesses never adopted it. Every witness for the government said Officer Tate was in this channel. We call it a channel because it's the parameters from, you know, the motorcycle might have been over a little, but it had to go through this. Every other witness said he was in this channel. The motorcycle was coming straight at him, and that's why he had to fire. The reaction time argument the counsel makes was about the first shot. That's the only testimony we got was about the first shot, how long it takes to identify a threat, raise your weapon, aim, and fire. There was absolutely no testimony about how long it takes to fire once you're aimed at a vehicle. Also, the estimate of 20 to 30 miles per hour, if it's on the 20 side, it decreased, according to Officer Tate's testimony, to between 8 and 12 as it passed him. So we're talking about a slowly moving motorcycle. Thank you, Your Honor. All right. We appreciate the argument. So helpful to get descriptions. The case argument is submitted.
judges: Strom, Fisher, Bybee